**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**COOKEVILLE DIVISION**

| | | |
|---|---|---|
| **MICHAEL LYNN POSTON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **No. 2:18-cv-00049** |
| **v.** | ) | |
| | ) | **CHIEF JUDGE CRENSHAW** |
| **DARREN SETTLES,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**<u>MEMORANDUM OPINION</u>**

Michael Lynn Poston, an inmate of the Bledsoe County Correctional Complex in Pikeville, Tennessee, filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his 2012 conviction in the White County Criminal Court for one count of aggravated sexual battery. Petitioner is serving a term of imprisonment of eleven years in the Tennessee Department of Correction for this offense. (Doc. No. 1).

Presently pending before the Court is the Respondent's opposition to the habeas petition in which he asks the Court to dismiss the petition. (Doc. No. 17).

The petition is ripe for review, and this Court has jurisdiction pursuant to 28 U.S.C. § 2241(d). Having fully considered the record, the Court finds that an evidentiary hearing is not needed, and Petitioner is not entitled to relief. The petition therefore will be denied and this action will be dismissed.

**II.     Procedural History**

Petitioner was indicted by a White County grand jury of one count of aggravated sexual battery against his step-granddaughter. (Doc. No. 16, Attach. 1 at 63-64). Prior to trial, Petitioner filed a motion for change of venue, which was based on the victim's father being an employee of

the trial court clerk's office.  <u>State v. Poston</u>, No. M2012-02321-CCA-R3-CD, 2014 WL 309648, at *1 (Tenn. Crim. App. Jan. 28, 2014), <u>perm. app. denied</u> (Tenn. June 20, 2014). The trial court conducted a hearing and found that Petitioner had failed to show that he could not receive a fair trial in White County. <u>Id</u>.  However, the trial court agreed to leave the matter open until jury selection was complete. <u>Id</u>.  After a jury was successfully seated, the trial court conducted a jury trial in January of 2012.  (Doc. No. 16, Attach. 3 at 2).  The jury convicted Petitioner as charged and, after a sentencing hearing, the trial court imposed a sentence of confinement of eleven years. (Doc. No. 16, Attach. 4 at 77).

Petitioner appealed, and Tennessee Court of Criminal Appeals affirmed his conviction and sentence. <u>State v. Poston</u>, 2014 WL 309648, at *1. The Tennessee Supreme Court declined discretionary review. <u>Id</u>.

On October 6, 2014, Petitioner filed a pro se petition for post-conviction relief in state court. (Doc. No. 16, Attach. 15 at 35).  Appointed counsel later filed an amended petition. (<u>Id</u>. at 78). After an evidentiary hearing, the post-conviction court denied the petition. (<u>Id</u>. at 134).

On appeal, the Tennessee Court of Criminal Appeals affirmed the denial of the post-conviction petition. <u>Poston v. State</u>, No. M2016-01693-CCA R3-PC, 2017 WL 4221147, at *7-8 (Tenn. Crim. App. Sept. 22, 2017), <u>perm. appeal denied</u> (Tenn. Sept. 22, 2017). The Tennessee Supreme Court again declined discretionary review. <u>Id</u>.

On May 21, 2018,[1] Petitioner filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. No. 1 at 17).  By Order entered on July 20, 2018, the Court ordered Respondent to file

---

[1] Under the "prison mailbox rule" of <u>Houston v. Lack</u>, 487 U.S. 266, 270 (1988), and the Sixth Circuit's subsequent extension of that rule in <u>Richard v. Ray</u>, 290 F.3d 810, 812 (6th Cir. 2002) and <u>Scott v. Evans</u>, 116 Fed. App'x 699, 701 (6th Cir. 2004), a prisoner's legal mail is considered "filed" when he deposits his mail in the prison mail system to be forwarded to the Clerk of Court.   Here, Plaintiff signed and dated his complaint on May 21, 2018, although the Clerk's Office did not receive and file the complaint until June 6, 2018.  Under the prison mailbox rule, the Court considers May 21, 2018, as the date of filing.

an answer, plead or otherwise respond to the petition. (Doc. No. 6). Respondent filed a response to the habeas petition on October 18, 2018, in which he concedes that the petition is timely and asks the Court to dismiss the petition. (Doc. No. 17). After receiving two letters from Petitioner, the Court granted Petitioner an extended period of time to reply to Respondent's response. (Doc. No. 20). Petitioner did not file a reply.

In his petition, Petitioner asserts seven claims for relief:

1.      The trial court erred by denying Petitioner's motion for recusal;

2.      The trial court erred by denying Petitioner's motion for change of venue;

3.      The trial court erred by failing to administer the oath to the victim before she testified at trial;

4.      The trial court erred by admitting hearsay statements of the victim;

5.      The evidence is legally insufficient to support the conviction;

6.      Petitioner's sentence is excessive because the trial court misapplied an enhancement factor; and

7.      Trial counsel provided ineffective assistance by failing to:

    a.      Sufficiently meet with Petitioner to fully advise him of his options and available defenses;

    b.      Investigate and call favorable defense witnesses at trial;

    c.      Adequately interview any of the State's witnesses or conduct a pretrial investigation;

    d.      File a motion for recusal of the trial judge;

    e.      Renew a motion for change of venue following jury selection;

    f.      Object to the unsworn testimony of the victim;

g.      Object to ex parte communication between the trial judge and the jury;

h.      Advise Petitioner of a plea offer from the State;

i.      Introduce exculpatory medical records of the victim;

j.      Thoroughly cross-examine Petitioner's wife about their arguments;

k.      Include a transcript of jury selection in the record on direct appeal.  (Doc. No. 1 at 5-12).

## III.    Summary of the Evidence

### A.      Trial Proceedings

The Tennessee Court of Criminal Appeals summarized the proof adduced at Petitioner's jury trial as follows:

> The trial court conducted a jury trial in January 2012. The victim, J.R.M., testified that she was 10 years of age and that she resided with her parents and her older brother. The victim testified that, on the evening of October 23, 2010, she was at home with her brother, her maternal grandmother, Mrs. Poston, and her stepgrandfather, the defendant. Mrs. Poston and the defendant were babysitting while the victim's parents were attending a Halloween party. The victim, her brother, her grandmother, and the defendant were all watching television in the living room, and, at some point, the defendant stood up and walked to the victim's parents' bedroom. The victim then decided to follow the defendant. The defendant was in bed, and the victim, who was wearing pajamas, went to bed as well. The victim fell asleep and woke up to the feel of the defendant's hands "[r]ubbing and pressing" on the victim's "chest, [her] butt, and [her] vagina." While the defendant was touching her, the victim was aware that "[t]he TV was on, I heard a phone, a zipper, and the bed was shaking." The victim felt scared, and she got out of the bed and went into the bathroom. She testified that, when she reached the bathroom, she was "crying" and "burning," and she asked her brother to get her grandmother. When her grandmother entered the bathroom, the victim told her what had happened. The victim's grandmother then drove the victim and her brother to pick up the victim's mother. When they returned to the victim's house, the defendant was no longer there.
>
> On cross-examination, the victim admitted that she had, at one time, a very good relationship with the defendant, whom she called "Pa," and that she had considered him to be her best friend. The victim denied following the defendant to the master bedroom when he first left the living room, stating that when she became bored with the movie some time later, she left the living room and went to the master

bedroom. The defendant was watching television in the master bedroom, and the victim watched television with him "for a couple of minutes" before she fell asleep. The victim admitted that her brother had walked by the bedroom several times and looked into the room.

Following the victim's testimony, the prosecutor requested a bench conference, at which point the following exchange occurred:

> Mr. Hatch: Your Honor, I don't believe [the victim] was sworn at the beginning of her testimony.

> The Court: I failed to swear the witness? We'll do that now.

> (Attorney[s] return to counsel table.)

> The Court: [J.R.M.], the attorneys told me something that I forgot. Very simple. Would you raise your right hand?

> (Witness is sworn.)

> The Court: And let me ask you, you've just testified and talked to both of the attorneys and answered their questions. Did you keep that oath, did you testify truthfully when you did that?

> [J.R.M.] Yes.

> The Court: Any other questions?

> Mr. Hatch: No, Your Honor.

> The Court: You may step down. Any reason why she would be recalled?

> Mr. Hatch: No, Your Honor.

> The Court: For you, Mr. Harris?

> Mr. Harris: No, Your Honor.

J.R.M.'s 12–year–old brother, J.L.M., testified that, on October 23, 2010, he and the victim were watching a movie at their house with his grandmother and the defendant while J.L.M.'s parents were attending a party. J.L.M. stated that the defendant left the living room at some point and retired to the master bedroom, and at some point, the victim left to go to the master bedroom as well. J.L.M. then left the living room and went to his own bedroom, which was past his parents' bedroom. When he walked past the master bedroom, he saw both the victim and the defendant

underneath the covers in the bed. J.L.M. later left his bedroom and returned to the living room. When he passed the master bedroom, he again witnessed the victim and the defendant underneath the covers. While J.L.M. and his grandmother were sitting in the living room, the victim ran down the hallway and was crying, which J.L.M. testified was "very unusual." J.L.M. stated that the victim ran into the bathroom and locked the door. J.L.M. attempted to enter the bathroom, but the victim would not allow him to enter. The victim told J.L.M. to tell their grandmother to come to the bathroom. After his grandmother entered the bathroom, J.L.M. waited in the house "for a while," and he then decided to go outside because the defendant had left the house and was shooting basketball. J.L.M. then went back inside the house to check on the victim, who was still in the bathroom with their grandmother. J.L.M. described the victim as having "blood shot red" eyes and stated that "she was still crying and she looked scared." J.L.M. testified that his grandmother "was crying also and she looked awkwardly."

J.L.M. testified that his grandmother then put both J.L.M. and the victim in the defendant's truck. He stated that the defendant attempted to get into the truck with them, but his grandmother would not allow him to enter the vehicle. J.L.M.'s grandmother drove the two children to the party their parents were attending and picked up J.L.M.'s mother. At that point, J.L.M.'s grandmother told his mother what had happened to the victim, and his mother "was sad and crying and mad at the same time." The group returned to J.L.M.'s house, but the defendant was no longer there, and J.L.M. testified that the defendant did not return to the house that night or the following morning.

On cross-examination, J.L.M. testified that, when the defendant left the living room to go the master bedroom, the victim followed soon after. Approximately five minutes later, J.L.M. walked back to his own bedroom to watch television. J.L.M. acknowledged that the door to the master bedroom was always open, and he stated that he walked past the master bedroom "six or seven times." J.L.M. testified that he made eye contact with the defendant when walking past, but he did not speak to him. J.L.M. agreed that the television in the master bedroom was on, but he did not know what the defendant was watching. J.L.M. testified that his grandmother never walked down the hallway to check on the defendant or the victim. J.L.M. estimated that the distance between the living room and the master bedroom was approximately 50 feet down a hallway. J.L.M. admitted that he did not see anything that had transpired in the master bedroom between the defendant and the victim. J.L.M. testified that the defendant left the house to shoot basketball and that he followed the defendant outside, where he stayed for less than five minutes. J.L.M. returned inside when he heard his grandmother calling for him.

J.L.M. admitted that, when he and the victim got in the defendant's truck with their grandmother, their grandmother did not inform the defendant of where they were going, and he acknowledged that his grandmother was angry with the defendant. J.L.M. stated that, when the defendant grabbed the door handle of the vehicle, his grandmother told the defendant, "[N]o," and she backed out of the driveway. Their

grandmother had locked the door to the house, and J.L.M. admitted that the defendant could not get back inside. J.L.M. acknowledged that he never witnessed the defendant's doing anything inappropriate with the victim or anyone else.

Mrs. Poston, the victim's grandmother and the defendant's wife, testified that she and the defendant had been married for 26 years. On the evening of October 23, Mrs. Poston and the defendant were babysitting Mrs. Poston's daughter's children, J.L.M. and the victim. Mrs. Poston and J.L.M. were watching television in the living room when Mrs. Poston heard the victim "just kind of sniffing" behind her. The victim then went into the bathroom, and Mrs. Poston followed her into the bathroom a short time later when J.L.M. indicated that the victim was asking for her. When Mrs. Poston entered the bathroom, the victim was shaken up, crying, and was "visibly upset." At that point, the victim told Mrs. Poston that the defendant "had touched her on her pee pee and touched her on her boobs." Mrs. Poston clarified that the victim referred to her vagina as her "pee pee." After helping the victim calm down, Mrs. Poston took the victim and J.L.M. out of the house, and the three of them got into the defendant's truck. Mrs. Poston testified that the defendant asked what was wrong, but Mrs. Poston did not allow the defendant to enter the vehicle. Mrs. Poston drove the children to pick up their mother, and the group returned to the house. Mrs. Poston stated that, when they returned to the house, the defendant was no longer there, and she did not see him return to the house that evening or the following morning.

On cross-examination, Mrs. Poston stated that, during the course of the evening of October 23, she went to the bathroom, and she noticed the victim and the defendant on the bed in the master bedroom watching television; she noticed that the victim was giggling. Nothing seemed out of the ordinary at that time. Mrs. Poston acknowledged that, when she left the victim's home on October 23, she locked the door and took the defendant's truck. She also admitted that the defendant's car keys also contained the keys to the defendant's and Mrs. Poston's house so that the defendant was unable to access either residence.

Deputy Bobby Farris with the White County Sheriff's Department testified that he responded to a possible sexual misconduct call at the victim's residence at approximately 1:00 a.m. on October 24, 2010. Upon his arrival, he encountered Mrs. Poston, the victim's mother, D.M., and the victim, whom he described as "pretty much hysterical, very upset, crying continuously." After interviewing those present, Deputy Farris determined that the defendant was the suspect in the alleged aggravated sexual battery, but the defendant was no longer present at the residence. Deputy Farris conducted a search of the immediate area around the victim's residence, and he then searched for the defendant at both his current and former residences, as well as the residence of a friend of the defendant's. Deputy Farris's shift ended at 6:30 a.m., and he had been unable to locate the defendant.

On cross-examination, Deputy Farris admitted that he could not recall with any certainty whether he had attempted to contact the defendant on the defendant's

cellular telephone. Deputy Farris stated that he neither knew that the defendant had been locked out of the house, nor was he aware that the defendant did not have access to his truck or the keys to his own house.

Investigator Terry Hembree with the White County District Attorney General's Office testified that he interviewed the defendant on October 27, 2010. After signing a waiver of rights form, the defendant consented to speak with Investigator Hembree. According to Investigator Hembree, the defendant claimed to have a "very good relationship" with the victim. The defendant admitted to lying on the bed with the victim in the master bedroom of her residence on the evening of October 23 for "approximately two hours" while the two of them watched television. The defendant said that the victim had fallen asleep "briefly" and that she later left the bedroom to go into the living room. The defendant did not mention anything about the victim's crying. The defendant claimed that, after the victim left the bedroom, he went outside to "use the bathroom" and play basketball. While he was outside, the defendant heard the victim crying but "he was not aware of any reason" why she would be crying. The defendant stated that he saw his wife leave with the grandchildren but that she would not tell him why they were leaving the house. The defendant initially told Investigator Hembree that he left the house shortly after his wife left, but he later stated that he remained at the residence until his wife returned to the house with the grandchildren. His stated reason for leaving the house was that "he had gotten into an argument with [Mrs. Poston] and that he decided he was just going to walk home." The defendant confirmed that, as he was walking away from the victim's house, he saw a sheriff's department car "fly past him." Investigator Hembree asked the defendant if he had called his family to check on their welfare after seeing the sheriff's department car speeding toward his stepdaughter's house, and he responded, "[T]hey didn't call me."

On cross-examination, Investigator Hembree admitted that he had sent the defendant's cellular telephone to the Tennessee Bureau of Investigation Crime Laboratory ("TBI Crime Lab") to determine if there were any photographs on the telephone that would constitute the sexual exploitation of a minor, and the TBI Crime Lab was unable to find any inappropriate photographs on the defendant's telephone.

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgment of acquittal and a Momon colloquy, see Momon v. State, 18 S.W.3d 152, 161–62 (Tenn.1999), the defendant elected to testify.

The defendant testified that he had been married to Mrs. Poston for 26 years and that Mrs. Poston's daughter, D.M., was four years old when they married. On the evening of October 23, 2010, the defendant and his wife arrived at the victim's house in the late afternoon to babysit their grandchildren. After the victim's parents left to attend a party, the defendant, Mrs. Poston, J.L.M., and the victim were watching a University of Tennessee football game in the living room. At some point, the victim indicated that she was hungry, and the defendant and the victim

went into the kitchen to make something to eat. When they returned to the living room, Mrs. Poston had changed the television channel to a different program. After finishing his food, the defendant announced that he was going to the master bedroom to watch the football game, and the victim told him that she was going to accompany him. The defendant eventually lost interest in the game, and he began changing channels. The victim asked the defendant to turn the television to her favorite cartoon channel, and he complied. The defendant stated that he and the victim watched the cartoon channel for a little over one hour, and, at some point, he believed that the victim had fallen asleep.

The defendant testified that the bed in the master bedroom faced the hallway and that the bedroom door was always open. The defendant recalled J.L.M.'s walking past the room two to three times, and he stated that his wife entered the master bedroom two to three times while he was watching television with the victim. The defendant testified that both the victim and J.L.M. had slept in the bed with him and Mrs. Poston in the past.

The defendant denied touching the victim in an inappropriate way on the evening of October 23, and he denied using his cellular telephone to take photographs of the victim. When asked what prompted him to leave the master bedroom that night, the defendant responded that he "was just tired of laying there and I jumped up, or didn't jump up, I got out of bed and when I got out, I guess it woke [the victim] up, cause she got up and walked out behind me." The defendant testified that he entered the living room and conversed with Mrs. Poston and J.L.M. for "a few minutes," while the victim stood behind Mrs. Poston. The defendant stated that the victim then turned and walked to the bathroom. A few minutes later, the defendant determined that he, too, needed to use the restroom, so he walked to the bathroom where the victim had gone and discovered it was locked. The defendant then walked outside to relieve himself, and J.L.M. walked outside with him. The defendant and J.L.M. played basketball for a few minutes. The defendant then testified to the events that followed:

> The basketball went toward the front door and then [J.L.M.] come [sic] back and he said Pa, he said Sissy is crying. And I said she is, he said yeah. Well we kept playing basketball and he said wonder what she's crying for. I said Honey, I don't know, but I says we'll find out. And he said well I seen Nanna going in there. And I said well, Nanna will come out and she'll tell us why in a few minutes.

> And it wasn't but just a few minutes [Mrs. Poston] come out and she called for [J.L.M.] to come back in. And he come, he went in and it wasn't just a few minutes that all three of them walked and me and [Mrs. Poston], she says I'm going to pick [D.M.] up cause [D.M.] is sick. And I said well let me go pick her up and the kids can stay here. She said no, she called me and wanted me to come and pick her up

9

and I want to go pick her up. And I said well let me ride with you, she said I told you you wasn't going and you're not going.

And so I had the keys in my pocket and I throwed them to her. I said here, you'll have to have the keys. And they got in the car and they left.

After Mrs. Poston left with the children, the defendant discovered that the door to the house was locked. He waited outside the house until he saw Mrs. Poston returning in his vehicle, and he then walked around behind the house and "down the mountain." The defendant stated that he left because he "didn't want to argue with" his wife. The defendant testified that he walked to his apartment, but when he discovered that it, too, was locked, he walked "across town" to his mother's house. He denied that he was aware the police were searching for him. In response to questioning about the victim's motivation for leveling these accusations against him, the defendant replied that he had "no idea" why she would make such claims, "[u]nless she was mad or aggravated at me."

Based on this evidence, the jury convicted the defendant as charged of aggravated sexual battery. Following a sentencing hearing, the trial court imposed a sentence of 11 years.

State v. Poston, 2014 WL 309648, at **1-6.

**B.      Post-Conviction Proceedings**

The Tennessee Court of Criminal Appeals summarized the proof adduced at Petitioner's

post-conviction evidentiary hearing as follows:

The Petitioner's conviction relates to the unlawful touching of his step-granddaughter. The victim's father was an employee of the trial court clerk's office. Trial counsel moved for a change of venue based upon the father's employment, and the trial court denied the motion. The Petitioner was represented by a different attorney at the trial than in the motion for a new trial. On appeal, this court affirmed the trial court's denial of the motion for change of venue. Also on appeal, the Petitioner raised an issue regarding the trial judge's failure to recuse himself based upon his professional acquaintance with the victim's father, but this court noted the absence from the record of a motion and a hearing transcript relative to a motion for recusal and presumed that the trial court's ruling had been correct. State v. Michael Lynn Poston, No. M2012–02321–CCA–R3–CD, 2014 WL 309648 (Tenn. Crim. App. Jan. 28, 2014), perm. app. denied (Tenn. June 20, 2014). As relevant to this appeal, the post-conviction petition and the amended petition allege that trial counsel provided ineffective assistance by failing to file a motion for recusal and that the trial judge engaged in improper ex parte communication with the jury during its deliberations.

At the post-conviction hearing, the trial judge was called as a witness and testified that he recalled speaking with the jury once during their deliberations. He said that he asked if they would like the court clerk to order food for them. He did not recall speaking with them any other time during the "proceedings." He said that before entering the jury room, he asked the attorneys for the State and the defense whether they objected to his asking the jury whether they wanted food and that the attorneys had not objected. When asked if he took food to the jurors, he said he did not think they requested food. When asked if an occasion arose in which the jury asked him a question during the jury's deliberations, he answered, "Never."

The trial judge testified that trial counsel filed a motion for a change of venue before the Petitioner's trial and that the court had conducted a hearing on the motion. The trial judge stated that he had reserved his ruling on the motion until completion of voir dire. The trial judge agreed that, ultimately, he had allowed nine peremptory challenges, rather than the "normal" eight, "because of the alternates in this case." The defense's peremptory challenge sheet was received as an exhibit, and it reflected that the defense exercised eight challenges. The trial judge did not recall trial counsel's requesting removal of an empaneled juror during the trial.

The trial judge testified that he knew the victim's father worked in the clerk's office. When asked if the victim's father handled "only child support and civil matters," the judge stated, "He is not a clerk that's assigned to this court that I've ever seen." The trial judge stated that his interaction with the victim's father was "[n]othing more" than his interactions with a court officer or a person who appeared in his courtroom. The trial judge identified trial counsel's fee claim form, which reflected that the court approved fees of over $3000, which the judge said was appropriate for a case of this nature. The judge noted that, ultimately, counsel received $1552.64.

Brenda Phillips, the Petitioner's sister, testified that she attempted to speak with trial counsel before the Petitioner's trial but that counsel never spoke with her. She said "we" attempted to speak to counsel "several times" during court breaks. She said that counsel asked "us" to call him later but that counsel did not take the calls. She said that when the Petitioner was going to a meeting with counsel regarding trial preparation, "we said tell him that we want to talk to him" but that counsel refused and did not want to talk to "us." She did not identify who, other than she, wanted to speak with counsel. Ms. Phillips said that she was not an eyewitness to the events underlying the Petitioner's conviction but that the Petitioner's wife had called her on the night of the relevant events.

Linda Powell, the Petitioner's sister, testified that she attempted to schedule meetings with trial counsel. She said he did not meet with her.

Myrna Poston, the Petitioner's wife, testified that she attempted to speak with trial counsel on several occasions. She said counsel had been present at his office about two times but that on five or six occasions, his office had been locked or an

employee had advised her that he was not present. She said counsel did not follow up with her after missing the meetings. She said that during the trial, counsel appeared unconcerned about the missed meetings.

Ms. Poston testified that before the trial, Ms. Powell tried to persuade Ms. Poston not to testify against the Petitioner. Ms. Poston agreed that Ms. Powell called the victim a "lying b----." When asked if she had been pressured by the Petitioner "or people in his camp" to testify in a way other than how she ultimately testified, Ms. Poston responded, "Well it was [an] upsetting time for everybody."

The Petitioner testified that he tried to meet with trial counsel several times before the trial on January 4 of an unspecified year. The Petitioner said counsel would state that he was busy but would contact the Petitioner. The Petitioner stated that when he called counsel, counsel would state that he was going to be in Sparta on a specified date and would call the Petitioner but that counsel never called. The Petitioner stated that when he called counsel after not hearing from him on the specified dates, counsel would say that something had "come up" and that counsel was on his way back to Cookeville. The Petitioner stated that counsel eventually called him and told him to be ready to spend all day at counsel's office on January 1 through January 3 to prepare for the January 4 trial. The Petitioner stated that he arrived as instructed at counsel's office at 8:00 a.m. on January 1, that counsel arrived around 9:00 a.m., that counsel left at 9:20 a.m. after stating he had something to do, and that counsel told the Petitioner to return the next morning. The Petitioner stated that he arrived at counsel's office at 8:00 a.m. on January 2, that counsel arrived around 8:30 a.m., that they met for about thirty minutes, and that counsel made a telephone call and stated he had to leave. The Petitioner stated that counsel was about one and one-half hours late for their meeting on January 3, that they talked for fifteen to twenty minutes, that counsel stated, "I think we've got it downpat [sic]," and that their meeting concluded. The Petitioner estimated that he met with counsel for a total of forty-five minutes to one hour on January 1 through January 3. The Petitioner stated that if counsel's fee claim reflected that they met in excess of eight or nine hours, he disputed the information on the fee claim. He acknowledged his wife's testimony that she met with counsel but had no personal knowledge of their meeting. He acknowledged that counsel advised him that if he were convicted at the trial, he would be subject to the sex offender registry, community supervision for life, 100% service of his sentence, and Range II sentencing.

The Petitioner testified that he had asked trial counsel to contact John Holtzclaw, Julie Holtzclaw, Mike Sparks, and Rhonda Grilty as potential witnesses. The Petitioner said that counsel told him to provide counsel with the witnesses' names and addresses in order for counsel to subpoena them. The Petitioner said that although he provided the information and told counsel he wanted the witnesses to testify, counsel stated "[a]t court day" that they did not need the witnesses and that the Petitioner should trust counsel. The Petitioner was unaware of counsel's ever speaking with the potential witnesses. The Petitioner said he and counsel never

discussed the facts to which these witnesses could testify. The Petitioner did not know if counsel reviewed pretrial statements from the victim and another witness who had been in the home on the night of the offense. The Petitioner said he and counsel discussed the defense, which was that the Petitioner did not commit the offense. The Petitioner agreed that the defense plan was for counsel to cross-examine the victim, the Petitioner's wife, and another witness who had been in the home and for the Petitioner to testify that he did not commit the offense. The Petitioner agreed that at the trial, counsel cross-examined the victim and the Petitioner's wife and that the Petitioner testified on his own behalf. He agreed that he and the victim had been alone in a bedroom on the night of the offense.

The Petitioner testified that he spoke with trial counsel about filing a motion for recusal of the trial judge. When asked if counsel pursued the motion, the Petitioner said, "Not the way I wanted to[.]" The Petitioner agreed that counsel filed a motion for change of venue and said he had "no idea" whether counsel "follow[ed] up" on the motion for change of venue during the voir dire process. The Petitioner stated that although counsel exercised eight peremptory challenges, the Petitioner had wanted counsel to strike an additional juror whom counsel did not strike. The Petitioner disagreed that counsel attempted to have this juror removed the day after jury selection. He did not recall counsel's having made a motion to have a juror removed because the juror knew the victim's father. The Petitioner said counsel did not strike the juror whom the Petitioner wanted removed.

The Petitioner testified that trial counsel did not make a timely objection when the victim testified at the trial without being sworn as a witness. The Petitioner agreed that the victim was sworn at the end of her testimony and that she stated she had testified truthfully. The Petitioner stated that every time he "had [an] answer or a question," counsel told him to trust counsel and said, "I've got this." The Petitioner said counsel never communicated any plea offers to him. The Petitioner said he was aware of "certain medical records" and wanted counsel to investigate the records but that the Petitioner was unaware of counsel's having done so. The Petitioner said the medical records were relevant, despite the lack of any allegation of penetration, because the victim had stated his fingernails had hurt her. He said the records contained statements that the victim had "not been touched." The Petitioner stated that he wanted counsel to investigate how the Petitioner and the Petitioner's wife handled their disputes but that counsel never addressed the issue with the Petitioner's wife. The Petitioner said that his behavior of having walked away from the house after arguing with his wife and after she left in his truck with the victim and another child was consistent with his habit of walking away from their arguments.

Trial counsel testified that his fee claim for the Petitioner's conviction proceedings reflected 7.9 in-court hours and 64.4 out-of-court hours. Counsel said that he was only paid for about one-half of the time he spent working on the Petitioner's case and that "at some point once you've gone over a certain number of hours, you really almost don't even keep records anymore." He said he might have worked more

hours on the case than his fee claim reflected. He said the fee claim petition had been filed for him by a "service" based upon information he provided. Counsel said the fee claim reflected the following meetings with the Petitioner: 1.5 hours on April 26, 2011; an unspecified time on May 1, 2011; two hours on May 8, 2011; 1.5 hours on August 8, 2011. Counsel said the fee claim reflected six hours of trial preparation on January 2 of an unidentified year and that some of this time involved a meeting with the Petitioner and that some of it involved reviewing documents and other tasks.

Trial counsel had no notes or recollection of the Petitioner's having mentioned John Holtzclaw, Julie Holtzclaw, Mike Sparks, or Rhonda Grilty as potential witnesses. He said that none of these individuals were present at the house on the night of the crime and that the Petitioner never mentioned any fact witnesses who could testify that the offense did not occur. Counsel said, though, that he and the Petitioner discussed potential character witnesses and that these individuals may have been the Petitioner's proposed character witnesses. Counsel said he advised the Petitioner that character witnesses would not be helpful and that the case turned on the victim's word against the Petitioner's word. Counsel said that he advised the Petitioner he was not going to call character witnesses and that the Petitioner said nothing further about the issue. Counsel thought that the Petitioner gave him a list of witnesses and that counsel had made telephone calls to locate potential witnesses.

Trial counsel testified that he talked to the Petitioner's wife and that he thought she was in a difficult position. He thought her testimony would be somewhat helpful and noted that she seemed anxious about testifying, but he did not want to call her as a witness and "ask a question you don't know the answer to ... and then get burned." Counsel also noted that the Petitioner's wife had been in the house and that "the door was open and that was established at trial." Counsel said the Petitioner's wife stood by her statements that were in the discovery materials and that the question was whether she would be supportive of the Petitioner in her testimony. Counsel said that he knew the State would call the Petitioner's wife as a witness.

Trial counsel testified that he was aware of the Petitioner's prior felony convictions that could be used to impeach the Petitioner's credibility. When counsel was asked why he did not elect to present character witnesses to repair the Petitioner's credibility, counsel said that a few days before the trial, it was apparent the Petitioner's wife "wasn't going to buttress his character." Counsel said that if the person with whom the Petitioner lived would not vouch for his character, counsel did not want to raise the issue.

Trial counsel testified that one of the Petitioner's sisters tried to meet with counsel. He thought that he talked to her by telephone and that the information she had "was nothing." He noted that the Petitioner's sisters were not in the house on the night of the offense. He said he did not investigate the Petitioner's sisters as potential character witnesses.

Trial counsel testified that he discussed plea offers with the Petitioner, although he could not remember the details. Counsel recalled an offer that involved a lengthy sentence of more than ten years and said he had thought he would never be able to "sell" the offer to the Petitioner. Counsel said he advised the Petitioner of the possibility of being subject to community supervision for life, having to be listed on the sex offender registry, 100% service of a sentence, and the possible length of a sentence. Counsel said the Petitioner did not want to plead guilty due to the length of the sentence prescribed by the offer and because it would ruin his marriage and his family life. Counsel said the Petitioner maintained his innocence.

Trial counsel testified that he and the Petitioner went to an office supply store to make copies and that counsel provided the Petitioner with copies of all of the discovery materials. Counsel said he reviewed the discovery materials with the Petitioner.

Trial counsel testified that he did not file a motion for the trial judge to recuse himself because counsel did not think the motion would be successful. He said that the Petitioner was concerned about receiving fair treatment from the clerk's office but never spoke with counsel directly about a motion for recusal. Counsel said that instead of a motion for recusal, he filed a motion for a change of venue. Counsel agreed that the trial court reserved ruling on the motion until the completion of voir dire. He agreed that the defense had one unexercised peremptory challenge remaining at the end of jury selection. Counsel said he consulted with the Petitioner about prospective jurors and noted that he relied on the Petitioner's knowledge of jurors because counsel did not live in Sparta. He had no recollection of having asked the court to excuse a juror after the jury had been selected but agreed that the trial transcript spoke for itself in this regard. He thought the court excused this juror for cause. Counsel said he did not raise the change of venue issue a second time because nothing that occurred in voir dire added to the argument for a change of venue. He said he understood that failing to raise the issue would waive appellate review.

Trial counsel testified that he prepared for the victim's testimony and cross-examination by reviewing the victim's pretrial statement in the discovery materials. He said he spoke to the victim's father and was aware of her family's feelings about the matter. He said he did not speak to the victim and did not think her parents would have allowed it. He acknowledged he had not raised the issue of the victim's not having been sworn and said he had not noticed but someone else must have noticed because she was sworn at the end of her testimony. He agreed that the victim stated her previously unsworn testimony had been truthful. Counsel said the trial judge summarized the victim's previous testimony, and in counsel's opinion, it would not have been helpful to the defense for the victim to have testified and to have been cross-examined again.

Trial counsel testified that calling medical providers as witnesses would not have been helpful to the defense because they would have corroborated the victim's statements to them regarding the Defendant's touching her inappropriately. Counsel

said the medical reports were not conclusive as regards to corroborating the victim's account of a touching. Counsel said the Petitioner knew how counsel was approaching the case.

Trial counsel testified that he had been involved in many trials in which the trial judge "might stick his head" in the jury room and inquire whether the jury wanted food. Counsel did not recall the judge going into the jury room other than to inquire about food. He did not recall the judge's asking the attorneys if they objected to the judge's asking the jury if they wanted food. Counsel said, however, that he had no issue with the judge speaking with the jury about food.

Trial counsel testified that he had been disbarred. He said that his wife passed away after battling breast cancer for six and one-half years and that about six months after his wife's death, he wrote letters to his clients advising them that he was quitting the practice of law. He said he "never responded to the bar." He said that after he wrote the letters to his clients, he did not communicate with them because their questions were too stressful. He said this occurred two years after his representation of the Petitioner had concluded. He said in 2011 and early 2012, his wife's illness did not create a problem with his ability to practice law.

After receiving the proof, the post-conviction court denied relief.

Poston v. State, 2017 WL 4221147, at **1-5.

IV.    **Standard of Review**

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." Woodford v. Garceau, 538 U.S. 202, 206  (2003) (internal citations and quotation marks omitted). As the Supreme Court explained, the AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." Burt v. Titlow, 571 U.S. 12, 19 (2013).  The AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Id.

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S .C. § 2254(d).  Under the AEDPA, the court may grant

a writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 405 (2000).

The state court's factual findings are presumed to be correct and they can be contravened only if the petitioner can show by clear and convincing evidence that the state court's factual findings were erroneous. 28 U.S.C. § 2254(e)(1). As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citing Williams, 529 U.S. at 410). Review under § 2254(d) (1) "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 182 (2011).

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Baldwin v. Reese, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." Id. (citation omitted); Gray v. Netherland, 518 U.S. 152, 162–63 (1996) (the substance of the claim must have been presented as a federal constitutional claim). This rule has been interpreted by the

Supreme Court as one of total exhaustion. <u>Rose v. Lundy</u>, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. <u>See</u> <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971); <u>see also</u> <u>Pillette v. Foltz</u>, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review").

Claims that are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." <u>Alley v. Bell</u>, 307 F.3d 380, 388 (6th Cir. 2002). "In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." <u>Id</u>. at 386. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. <u>Lucas v. O'Dea</u>, 179 F.3d 412, 418 (6th Cir. 1999) (citing <u>Coleman v. Thompson</u>, 501 U.S. 722, 754 (1991)).

A petitioner may establish cause by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. <u>Id</u>. Constitutionally ineffective assistance of trial or appellate counsel may constitute cause. <u>Murray</u>, 477 U.S. at 488–89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. <u>Id</u>. If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. <u>Edwards v. Carpenter</u>, 529 U.S. 446, 452-53 (2000).

Petitioners in Tennessee also can establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial review post-conviction proceedings. See Martinez v. Ryan, 566 U.S. 1, 5-6 (2012) (creating an exception to Coleman where state law prohibits ineffective assistance claims on direct appeal); Trevino v. Thaler, 569 U.S. 413, 429 (2013) (extending Martinez to states with procedural frameworks that make meaningful opportunity to raise ineffective assistance claim on direct appeal unlikely); Sutton v. Carpenter, 745 F.3d 787, 792 (6th Cir. 2014) (holding that Martinez and Trevino apply in Tennessee). The Supreme Court's creation in Martinez of a narrow exception to the procedural default bar stemmed from the recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." Martinez, 566 U.S. at 13. In other words, Martinez requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." See id. at 13-15. Importantly, Martinez did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in Coleman.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." Perkins v. LeCureux, 58 F.3d 214, 219 (6th Cir. 1995) (quoting United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court also has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. Dretke v. Haley, 541 U.S. 386, 392 (citing Murray, 477 U.S. at 496).

## V.      Analysis

With these principles in mind, the Court will turn to the examination of the claims raised in Poston's petition for habeas relief.

### A.      Trial court erred in denying the motion for recusal

First, Petitioner contends that the trial court erred by denying his motion for recusal premised on the trial court judge's familiarity with the victim's father, who was employed as a deputy clerk in the White County Clerk's Office. (Doc. No. 1 at 5). According to Petitioner, the victim's father and the trial court judge "were well known to one another" and, further, "the jury would enter and walk past the area where the victim's father worked, and thus might associate him with the Court." (Id.) Respondent contends that this claim is not a cognizable claim for federal habeas corpus relief because Petitioner alleges only a violation of state law. (Doc. No. 17 at 16-17).

On direct appeal, Petitioner argued that the trial court judge erred when he did not recuse himself sua sponte under Tennessee Supreme Court Rule 10, Code of Judicial Conduct Rule 2.11. (Doc. No. 16, Attach. 8 at 13-14). Rule 10 provides that "[a] judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned . . . ." Tenn. S. Ct. R. 10. Petitioner's argument, then, was that the trial court judge did not comply with

Tennessee law when he failed to recuse himself.  Petitioner's brief did not cite a single federal case, statute, or constitutional provision.

In reviewing Petitioner's recusal claim, the Tennessee Court of Criminal Appeals found that Petitioner had failed to file a written motion for recusal and the trial transcript did not reflect that trial counsel made an oral motion for recusal.  State v. Poston, 2014 WL 309648, at **6-7. The court concluded:

> In the absence of a transcript of a hearing on the motion to recuse, we are without the facts upon which the trial court relied to make its determination.  Given this deficiency in the record, review of the trial court's denial of the defendant's motion is impossible, and we must presume the trial court's ruling was correct.

Id.  In its opinion, the Tennessee Court of Criminal Appeals made no reference to federal law and did not treat Petitioner's claim as one brought under federal law.  (Id.)  Consequently, the Court finds that Petitioner's claim, brought on direct appeal, that the trial judge violated the Tennessee Code of Judicial Conduct in not recusing himself raised a question solely of state law.

However, error in the application of state law is not cognizable in a federal habeas proceeding. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); Pulley v. Harris, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law.").  For a federal claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." Anderson v. Harless, 459 U.S. 4, 6  (1982) (per curiam). Nor is it enough to make a "general appeal" to a broad constitutional guarantee. Gray v. Netherland, 518 U.S. 152, 163 (1996).  Accordingly, to the extent that Petitioner asks the Court to re-examine this state law claim in federal habeas, the claim will be dismissed.  See White v. Tenn., No. 2:14-cv-116, 2017 WL 4364073, at **6-7 (E.D. Tenn. Sept. 29, 2017) (dismissing as non-cognizable a federal habeas

claim that the state trial judge failed to recuse himself under the standards of the Tennessee Code of Judicial Conduct).

To the extent that Petitioner now claims his federal constitutional rights were violated when the trial court denied his motion for recusal, "[a] constitutional claim presented to the federal courts that does not rest on the same theory as was presented to the state courts is procedurally defaulted." Wong v. Woney, 142 F.3d 313, 321-22 (6th Cir. 1998). In order to preserve a federal constitutional claim for presentation in habeas corpus, the claim must be "fairly presented" to the state courts in a way that provides them with an opportunity to remedy the asserted constitutional violation, including presenting both the legal and factual basis of the claim. Williams v. Anderson, 460 F.3d 789, 806 (6th Cir. 2006); Levine v. Torvik, 986 F.2d 1506, 1516 (6th Cir. 1993), cert. denied, 509 U.S. 907 (1993), overruled in part on other grounds by Thompson v. Keohane, 516 U.S. 99 (1995); Riggins v. McMackin, 935 F.2d 790, 792 (6th Cir. 1991). The claim must be fairly presented at every stage of the state appellate process. Wagner v. Smith, 581 F.3d 410, 418 (6th Cir. 2009). In reviewing the state court proceedings to determine whether a petitioner has "fairly presented" a claim to the state courts, courts look to the petitioner's: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law." Slaughter v. Parker, 450 F.3d 224, 236 (6th Cir. 2006) (quoting Whiting v. Burt, 395 F.3d 602, 613 (6th Cir. 2005)). "While a petitioner need not cite 'chapter and verse' of constitutional law, 'general allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present claims' that specific constitutional rights were violated." Slaughter, 450 F.3d at 236 (quoting Blackmon v. Booker, 394 F.3d 399, 400 (6th Cir. 2004)). "A lawyer need

not develop a constitutional argument at length, but he [or she] must make one; the words 'due process' are not an argument." <u>Riggins v. McGinnis</u>, 50 F.3d 492, 494 (7th Cir. 1995).

Petitioner did not fairly present a federal claim based on the denial of his motion for recusal to the state courts. <u>See</u> <u>Slaughter</u>, 450 F.3d 224, 236. The claim therefore is procedurally defaulted and barred from presentation to the state courts by Tennessee Rule of Appellate Procedure 4, the statute of limitations under Tennessee Code Annotated § 40-30-102(a), and the "one petition" limitation of § 40-30-102(c). As a result, the claim is deemed to be exhausted (because no avenue for raising the claim in state appellate court remains) but procedurally defaulted for the purpose of federal habeas review.

Federal habeas review of Petitioner's procedurally defaulted claim is barred unless Petitioner can demonstrate that cause and prejudice excuses the procedural default or that failure to consider the claim will result in a fundamental miscarriage of justice. <u>See</u> <u>Harris</u>, 489 U.S. at 262; <u>Coe</u>, 161 F.3d at 329-30. Petitioner presents no argument establishing cause and prejudice to excuse the default his claim, and there is no evidence that failure to consider this claim will result in a fundamental miscarriage of justice. Because Petitioner's federal claim is procedurally defaulted and Petitioner has not overcome the default, the claim is barred from review in this Court and must be dismissed on that basis. <u>See</u> <u>Wogenstahl v. Mitchell</u>, 668 F.3d 307, 321 (W.D. Mich. 2017) (explaining procedural default). Petitioner is not entitled to relief on this claim.

**B.      The trial court erred by denying Petitioner's motion for change of venue**

Next, Petitioner alleges that the trial court erred by denying his motion for a change of venue. (Doc. No. 1 at 6). The trial court conducted a hearing on Petitioner's motion for a change of venue. <u>Poston</u>, 2014 WL 309648, at *7. The court preliminarily denied the motion but held the issue open until after jury selection occurred. <u>Id</u>. After the jury was seated, the trial commenced in

White County. Id. Petitioner now argues that, because the victim's father had "undue influence over" the trial as a deputy clerk of the trial court, it was error for the trial court to deny Petitioner's motion for change of venue. (Id.) As with Petitioner's first claim, Respondent contends that this claim is not a cognizable ground for habeas corpus relief because it alleges a violation of state law rather than federal constitutional law. (Doc. No. 17 at 18).

Petitioner raised this claim on direct appeal, contending that the trial court erred by denying his motion for change of venue "based on the circumstances of the victim's father['s] being a Deputy Clerk of the court trying the case." Poston, 2014 WL 309648, at *7 (internal quotation marks omitted). In his appellate brief argument in support of this claim, Petitioner cited Tennessee Rule of Criminal Procedure 21 and Tennessee Code Annotated § 20-4-201. (Doc. No. 16, Attach. 8 at 15). Petitioner did not cite any federal cases, statutes, or rules.

In reviewing this claim, the Tennessee Court of Criminal Appeals first found that Petitioner failed to show that the trial court abused its discretion by not granting the motion for change of venue initially. Poston, 2014 WL 309648, at *8. Regarding any action the court took on the motion during jury selection, the appellate court further found that determining whether the trial court erred was "impossible" because Petitioner failed to provide a transcript of the voir dire proceedings or any further argument on the issue. Id. The state appellate court's decision made no reference to federal law and did not treat Petitioner's claim as one brought under federal law. The Court therefore finds that Petitioner's claim that the trial judge violated Tennessee law in failing to grant the motion for a change of venue raised solely a state law question. And, because error in the application of state law is not cognizable in a federal habeas proceeding, Estelle, 502 U.S. 62, at 67-68, the Court cannot re-examine Petitioner's state law venue claim in this federal habeas action.

The Court also finds that Petitioner did not fairly present this claim as a federal due process claim to the state courts. Slaughter, 450 F.3d at 236. The claim is now barred from presentation to the state courts by Tennessee Rule of Appellate Procedure 4, the statute of limitations under Tennessee Code Annotated § 40-30-102(a), and the "one petition" limitation of § 40-30-102(c). As a result, the claim is deemed to be exhausted (because no avenue for raising the claim in state appellate court remains) but procedurally defaulted for the purpose of federal habeas review.

As set forth above, in order to obtain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate both "cause" for the procedural default and actual prejudice resulting from the alleged constitutional errors. Coleman, 501 U.S. at 750. In this case, Petitioner does not assert cause for the procedural default. Because Petitioner's federal claim is procedurally defaulted and Petitioner has not overcome the default, and there is no evidence that failure to consider the claim will result in a fundamental miscarriage of justice, the claim is barred from review in this Court and must be dismissed on that basis. See Wogenstahl, 668 F.3d at 321. Petitioner is not entitled to relief on this claim.

### C. The trial court erred by failing to administer the oath to the victim before she testified

In his third claim of trial error, Petitioner contends that "the trial court erred by failing to swear victim prior to her testimony." (Doc. No. 1 at 8). Respondent argues that, just as with his first two claims, this claim is non-cognizable in this federal habeas corpus proceeding. (Doc. No. 17 at 18).

On direct appeal to the Tennessee Court of Criminal Appeals, the petitioner contended that the trial court erred in allowing the victim to offer unsworn testimony and "the court's curative measure of swearing in the witness and simply asking if her previous testimony was truthful was insufficient." (Doc. No. 16, Attach. 8 at 15). Petitioner argued that he was entitled to relief under

the Tennessee Rules of Evidence and several state law cases. (Doc. No. 16, Attach. 8 at 15-19). Petitioner's appellate brief included a block quote from a Tennessee Supreme Court setting forth the law regarding plain error. (Doc. No. 16, Attach. 8 at 18). The quoted language included citations to several federal cases, but Petitioner's brief did not cite to those cases for a proposition of federal constitutional law. The only legal argument presented in support of the claim was based entirely on state law and there was no mention of any federal constitutional claim. Consequently, the Court finds that Petitioner's claim that the trial judge violated Tennessee law and the Tennessee Rules of Evidence in failing to swear in the victim before she testified at trial raised a question solely of state law. However, because error in the application of state law is not cognizable in a federal habeas proceeding. Estelle, 502 U.S. 62, 67-68, to the extent that Petitioner asks the Court to re-examine this state law claim in federal habeas, the Court is unable to do so.

To the extent Petitioner now asserts a federal claim based on the trial court's alleged error in failing to administer the oath to the victim before she testified at trial, in order to qualify as exhausted, the claim must have been presented to the state's highest court and must have been presented in a form which allows the state court a full and fair opportunity to rule on the claim. Williams, 460 F.3d 789, 806. A claim may only be considered "fairly presented" if the petitioner asserted both a factual and legal basis for his claim in state court. McMeans v. Brigano, 228 F.3d 674, 681 (6th Cir. 2000). Because relief under § 2254 can only be based upon a violation of the United States Constitution or law or treaties of the United States, the claim must have been presented as an issue of federal constitutional law, not state law. See Anderson v. Harless, 459 U.S. 4, 6-7 (1982) ("It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made.") (internal citations omitted). The petitioner must have presented his claim in the state court "as a federal constitutional

issue-not merely as an issue arising under state law." Koontz v. Glossa, 731 F.2d 365, 368 (6th Cir. 1984).

Here, Petitioner failed to exhaust this claim as a federal claim in the state court proceedings because he failed to present this claim as one of federal constitutional law. See Thomas v. Dodson, No. 3:05-0635, 2006 WL 1288584, at *4 (M.D. Tenn. May 10, 2006) (finding that petitioner waived his claim for purposes of federal habeas corpus review when he failed to present the claim to the state court as one of federal constitutional law; petitioner cited only state cases and argued only that the state law had been violated). By failing to present the federal constitutional claim alleged in the instant petition to the state courts, the petitioner committed a procedural default. He, therefore, has waived his claim for purposes of federal habeas corpus review unless he establishes cause for the default and actual prejudice as a result of the alleged errors.

There is nothing in the record that indicates that the petitioner can satisfy either the cause and prejudice requirement or make a showing of a fundamental miscarriage of justice. Furthermore, "[a]lthough the Sixth Amendment protects [a p]etitioner's right to cross-examine all adverse witnesses, there is no case law recognizing a constitutional right to have the witnesses sworn." Aguilar v. Stovall, No. 08-10353, 2009 WL 2447412, at *8 (E.D. Mich. Aug. 7, 2009) (citing Elswick v. Parke, No. 87-6742, 1988 WL 117742 (6th Cir. Nov. 7, 1988)). Because Petitioner's federal claim is procedurally defaulted and Petitioner has not overcome the default, the claim, like Petitioner's other claims thus far, is barred from review in this Court and must be dismissed on that basis. See Wogenstahl, 668 F.3d at 321.

Petitioner's claim additionally is barred by procedural default because the state court's denial of his claim was based on an adequate and independent state law ground. As the United States Supreme Court explained:

> [i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

Coleman, 501 U.S. 722, 750. When a state court judgment appears to have rested primarily on federal law or was interwoven with federal law, a state procedural rule is an independent and adequate state ground only if the state court rendering judgment in the case clearly and expressly stated that its judgment rested on a procedural bar. See id. at 739; Harris v. Reed, 489 U.S. 255, 263 (1989). On the other hand, when it does not fairly appear that the state court rested its decision on federal grounds or its decision was interwoven with federal law, the presumption that the decision does not rest on independent and adequate state grounds does not apply. Coleman, 501 U.S. at 739. The Tennessee waiver rule, Tenn. Code Ann. § 40-30-106(g), constitutes an adequate and independent state procedural ground for denying relief. See Coe v. Bell, 161 F.3d 320, 329-331 (6th Cir. 1998) (holding that court was unable to reach merits of Coe's malice jury instructions claim because claim was procedurally barred due to Coe having waived claim by failing to raise it at trial, on direct appeal, or in his first state post-conviction motion).

Petitioner raised the instant claim before the Tennessee Court of Criminal Appeals on direct appeal. In dismissing the claim, the Tennessee Court of Criminal Appeals found that the claim was waived because Petitioner did not make a contemporaneous objection at trial to the trial judge's failure to swear in the victim prior to her testimony. State v. Poston, 2014 WL 309648, at *11. Thus, federal habeas review of the claim is barred unless Petitioner can demonstrate that cause and prejudice will excuse the procedural default or that failure to consider the claim will result in a fundamental miscarriage of justice. See Harris, 489 U.S. at 262; Coe, 161 F.3d at 329-

30. As with his other procedurally defaulted claims, Petitioner makes no attempt to demonstrate cause and prejudice to excuse his procedural default of this claim. The claim is procedurally defaulted and will be dismissed.

### D. The trial court erred by admitting hearsay statements of the victim

In his fourth claim of trial error, Petitioner contends that the trial court erred when it admitted the victim's statement to Petitioner's wife that Petitioner "had touched her on her pee pee and touch her on her boobs." (Doc. No. 1 at 10). According to Respondent, this claim is not a cognizable ground for habeas corpus relief because it alleges a violation of state evidentiary law. (Doc. No. 17 at 22).

"Errors of state law, including evidentiary rulings, which result in a denial of fundamental fairness will support relief in habeas corpus." Walker v. Engle, 703 F.2d 959, 962 (6th Cir. 1983). However, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court." Duncan v. Henry, 513 U.S. 364, 366 (1995).

Here, Petitioner failed to present this claim as one of federal constitutional law in the state court proceedings. On direct appeal, Petitioner asserted that the trial court erred by admitting into evidence the victim's statement to Mrs. Poston that Petitioner "had touched her on her pee pee and touched her on her boobs," which Petitioner alleged was inadmissible hearsay not subject to any exception under the Tennessee Rules of Evidence. State v. Poston, 2014 WL 309648, at *11; (Doc. No. 16, Attach. 8 at 19-21). Petitioner failed to cite any federal case law employing a constitutional analysis with respect to the pertinent federal right alleged and failed to present his federal constitutional claim in a manner that fairly alerted the state court to the federal nature of his claim.

By failing to present the federal constitutional claim alleged in the instant petition to the state courts, Petitioner committed a procedural default. He, therefore, has waived his claim for purposes of federal habeas corpus review unless he establishes cause for the default and actual prejudice as a result of the alleged errors. Petitioner has not satisfied either the cause and prejudice requirement or made a showing of a fundamental miscarriage of justice. This claim, therefore, will be dismissed.

### E.       Sufficiency of the evidence claim

Next, Petitioner alleges that the evidence was insufficient to sustain his conviction of aggravated sexual battery. (Doc. No. 1 at 11).

The Tennessee Court of Criminal Appeals considered Petitioner's sufficiency of evidence claim. State v. Poston, 2014 WL 309648, at *13. Therefore, this Court must presume the correctness of the state court's factual determinations. 28 U.S.C. § 2254(e)(1). Petitioner may rebut this presumption only with clear and convincing evidence. Warren v. Smith, 161 F.3d 358, 360-61 (6th Cir. 1998).

On sufficiency of the evidence challenges, habeas relief is warranted "only where the court finds, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Tucker v. Palmer, 541 F.3d 652, 656 (6th Cir. 2008) (internal quotation omitted); see Jackson v. Virginia, 443 U.S. 307, 319 (1979) ("Instead, the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt") (emphasis in original).

In considering Petitioner's sufficiency of evidence claims, the Tennessee Court of Criminal Appeals began by setting forth the correct legal standard:

A trial judge may direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the State rests or at the conclusion of all the evidence. See Tenn. R.Crim. P. 29(a); see generally Overturf v. State, 571 S.W.2d 837 (Tenn.1978). The standard by which the trial court determines a motion for judgment of acquittal at that time is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction. State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); State v. Anderson, 880 S.W.2d 720, 726 (Tenn. Crim. App. 1994). That is, "whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Winters, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither reweigh the evidence nor substitute its inferences for those drawn by the trier of fact. Id. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn.1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. Id.

Poston, 2014 WL 309648, at *13.

The court next considered the definition of the crime for which Petitioner was convicted:

As charged in this case, aggravated sexual battery "is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: ... The victim is less than thirteen (13) years of age." Id. § 39–13–504(a)(4). "Sexual contact" is defined as including "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Id. § 39–13–501(6). Finally, " '[i]ntimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." Id. § 39–13–501(2).

Id. at *13.

In challenging the sufficiency of the evidence used to convict him on direct appeal,

Petitioner contended that the State failed to establish the element of "reasonably construed as being

for the purpose of sexual arousal or gratification." (Doc. No. 16, Attach. 8 at 22-23). Rejecting Petitioner's argument, the Tennessee Court of Criminal Appeals first found that the evidence showed the victim awoke to the feel of the defendant's hands "[r]ubbing and pressing" on her "chest, [her] butt, and [her] vagina" and that while the defendant was touching her, the victim was aware that "[t]he TV was on, [she] heard a phone, a zipper, and the bed was shaking." State v. Poston, 2014 WL 309648, at *14. The appellate court further found that "[t]he fact that a nine-year-old girl awoke to discover her stepgrandfather was rubbing her chest, her buttocks, and genital area while she simultaneously heard the sound of a zipper and felt the bed shake is more than enough to 'be reasonably construed as being for the purpose of sexual arousal or gratification.'" Id. (citing Tenn. Code Ann. § 39-13-501(6)). The appellate court ultimately concluded that, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime of aggravated sexual battery. Respondent urges that this conclusion was not an unreasonable determination of the facts or an unreasonable application of the law.

"On a state prisoner's habeas petition challenging the insufficiency of the evidence," such as in the instant case, the court "must draw all available inferences and resolve all credibility issues in favor of the jury's verdict." Rodriguez v. Trombley, No. 2:06-cv-11795, 2010 WL 120222, at *14 (E.D. Mich. Jan. 8, 2010); see also Marshall v. Lonberger, 459 U.S. 422, 434 (1983) (on habeas review, a federal court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor was observed at trial). A habeas court must defer to the fact finder for its assessment of the credibility of witnesses. Matthews v. Abramajtys, 319 F.3d 780, 788-89 (6th Cir. 2003).

Given the evidence and testimony adduced at trial, the Court finds that the state court's decision to reject Petitioner's sufficiency of evidence claim was not an unreasonable application of the facts or law. The State introduced more than sufficient evidence for a rational juror to conclude beyond a reasonable doubt that Petitioner committed aggravated sexual battery as to J.R.M., who was above the age of three and below the age of thirteen at the time of the offense. Although Petitioner urges here, as he did on direct appeal, that the State did not prove his touching of the victim was "reasonably construed as being for the purpose of sexual arousal or gratification," the proof at trial contradicts Petitioner's argument. The evidence showed that the victim was nine years old at the time of the offense. She testified that, when Petitioner went to her parents' bedroom, she followed him and got into bed with him. She awoke to feel Petitioner's hands "[r]ubbing and pressing" on her "chest, [her] butt, and [her] vagina." State v. Poston, 2014 WL 3069648, at *14. While the defendant was touching her, the victim heard the sound of a zipper and felt the bed shaking. Id. Based on this evidence, a rational trier of fact could have found that Petitioner touched the victim in a manner that can be "reasonably construed as being for the purpose of sexual arousal or gratification" in violation of Tennessee Code Annotated § 39-13-501(6). Petitioner therefore is not entitled to habeas relief on this claim.

### F.   Petitioner's sentence is excessive because the trial court misapplied an enhancement factor

Petitioner contends that his eleven-year sentence is excessive because the trial court misapplied an enhancement factor. (Doc. No. 1 at 11). In particular, Petitioner argues that the evidence did not support an enhancement for "great personal injury." (Id.) According to Respondent, Petitioner has not stated a cognizable claim for relief. (Doc. No. 17 at 26).

On direct appeal, Petitioner similarly argued that the trial court improperly applied the enhancement factor that "the personal injuries inflicted upon . . . the victim [were] particularly

great." (Doc. No. 16, Attach. 8 at 24-25) (citing Tenn. Code Ann. § 40-35-114(6)).  The Tennessee Court of Criminal Appeals concluded that the record supported the length of sentence imposed in the case and, even if the trial court had misapplied this factor, the misapplication of a single enhancement factor will not invalidate a sentence when the trial court has not completely departed from state sentencing law.  State v. Poston, 2014 WL 309648, at **15-17.

A claim that the state courts misapplied Tennessee law in sentencing Petitioner is not cognizable in a federal habeas petition. See 28 U.S.C. § 2254(a) (a federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States"); see Estelle, 502 U.S. 62, 67–68 ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); Pulley v. Harris, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law.").  Simply put, this Court cannot consider whether Poston's sentence was imposed in violation of Tennessee law.  See Smith v. Parker, No. 10-1158-JDB-egb, 2013 WL 5409783, at *30 (W.D. Tenn. Sept. 25, 2013) (dismissing as procedurally defaulted the petitioner's federal habeas claim that Tennessee courts misapplied state law in sentencing him where petitioner couched his claim to the state courts as arising under state law only).

Further, Petitioner did not present this claim to the Tennessee Court of Criminal Appeals as a violation of federal law.  In his appellate brief, Petitioner argued that the proof in this case was insufficient to support a finding that the victim's emotional injuries and psychological scarring are "particularly great." (Doc. No. 16, Attach. 8 at 25).  He compared his case to State v. Hartman, No. M2000-02441-CA-R3-CD, 2002 WL 65996 (Tenn. Crim. App. Jan.. 17, 2002), in which the victim and her mother testified that the victim suffered from "nightmares, fear of being alone, and had been in counseling as a result of the crimes" as a result of the aggravated sexual battery.  Id.

at \*15.  In <u>Hartman</u>, the Tennessee Court of Criminal Appeals determined that the victim's and mother's testimony was insufficient to support the enhancement factor because the State had failed to prove that the injuries to the victims were greater than those that ordinarily occur in this type of crime.  (<u>Id</u>.)  In Petitioner's analysis, however, he failed to cite any federal case law employing a constitutional analysis with respect to the pertinent federal right alleged and failed to present his federal constitutional claim in a manner that fairly alerted the state court to the federal nature of his claim. (<u>Id</u>. at 24-25).

The proper application of sentencing enhancement and mitigating factors is a matter of state law. <u>See</u> <u>Wilson v. Corcoran</u>, 562 U.S. 1, 5 (2010); <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990); <u>Villasana v. Steward</u>, No. 3:13-cv-00596, 2014 WL 1883938, at \*8-9 (M.D. Tenn. May 12, 2014). The Supreme Court has "stated many times that federal habeas corpus relief does not lie for errors of state law." <u>Estelle</u>, 502 U.S. 62, 67-68 (internal quotation omitted).  Even if the Court could consider this claim, Petitioner procedurally defaulted it and has not shown cause for the default and actual prejudice as a result of the alleged error.  Further, Petitioner has not made a showing of a fundamental miscarriage of justice.   This claim, like the others thus far, must be dismissed.

### G.      Ineffective assistance of counsel claims

Petitioner alleges eleven ineffective assistance of counsel sub-claims.  (Doc. No. 1 at 12). Respondent argues that only one of those claims was properly exhausted in state court.  (Doc. No. 17 at 27).

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel.   To prevail on a claim of ineffective assistance of counsel, a petitioner must

show (1) deficient performance of counsel and (2) prejudice to the defendant. See Bell v. Cone, 535 U.S. 685, 694-95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. See Strickland v. Washington, 466 U.S. 668, 686-87 (1984); Combs v. Coyle, 205 F.3d 269, 278 (6th Cir. 2000), cert. denied, 531 U.S. 1035 (2000). In assessing performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91. Reasonable attorneys may disagree on the appropriate strategy for defending a client. Bigelow v. Williams, 367 F.3d 562, 570 (6th Cir. 2004). The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

A court hearing an ineffective assistance of counsel claim must consider the totality of the evidence. Strickland, 466 U.S. at 695. "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" West v. Seabold, 73 F.3d 81, 84 (6th Cir. 1996) (quoting United States v. Morrow, 977 F.2d 222, 229 (6th Cir. 1992) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689.

As discussed above, however, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless a petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of the United States Supreme Court, § 2254(d)(1); that it "involved an unreasonable application of" such law; or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1),(2). Thus, when a claim of ineffective assistance of counsel is raised in a federal habeas petition, such as here, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Harrington v. Richter, 562 U.S. 86, 101 (2011). As the Supreme Court clarified in Harrington:

> This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

Harrington, 562 U.S. at 101 (internal quotation marks and citation omitted).

### 1. Exhausted Claim

Petitioner alleges that trial counsel provided ineffective assistance by failing to file a motion for the trial court judge to recuse himself based on the victim's father being an employee of the trial court clerk's office. (Doc. No. 1 at 12).

Petitioner raised this claim in his petition for post-conviction relief, and the post-conviction court denied relief. On appeal from the denial of post-conviction relief, Petitioner argued that trial counsel should have filed a motion for recusal and, barring that, should have obtained Petitioner's

informed written consent not to file such a motion. <u>State v. Poston</u>, 2017 WL 4221147, at *6. In affirming the denial of relief, the Tennessee Court of Criminal Appeals accredited trial counsel's testimony that, in order to address the Petitioner's concern about being treated fairly by the clerk's office, counsel elected to file a motion for change of venue instead of a motion for recusal; he did not believe that a motion for recusal would be successful. <u>Id</u>. at *7. The Tennessee Court of Criminal Appeals found that "[t]he record reflects that counsel considered the Petitioner's concern about being treated fairly by the clerk's office and that counsel made an informed, strategic decisions to address the Petitioner's concern in the way he thought held the greater possibility for obtaining relief." <u>Id</u>. at *7.

It is a "longstanding and sound principle that matters of trial strategy are left to counsel's discretion." <u>Dixon v. Houk</u>, 737 F.3d 1003, 1012 (6th Cir. 2013). In order to fairly assess an attorney's performance, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time." <u>Strickland</u>, 466 U.S. at 689. "[S]trategic choices made after a thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable." <u>Id</u>. at 690.

During Petitioner's post-conviction hearing, the trial judge testified that the victim's father and the trial judge shared only a passing professional acquaintance and that the victim's father's job duties did not involve matters in the trial judge's court. <u>Poston</u>, 2017 WL 4221147, at *7; (Doc. No. 16, Attach. 15 at 853). Trial counsel testified that, in his opinion, there was no "basis" to seek recusal of the trial judge, so he filed a motion for change of venue instead which, if successful, would have avoided any involvement by the clerk's office where the victim's father worked. (Doc. No. 16, Attach. 15 at 904, 928-29). After a hearing, the trial judge took the motion

under advisement, pending jury selection. (Id. at 904-05). After voir dire of the prospective jurors, trial counsel concluded that "there was no evidence to support . . . a change of venue." (Id. at 929). Based on these facts, counsel made a reasonable and informed strategic decision not to file a motion for recusal.

The Court finds that Petitioner has not shown that he is entitled to relief on this claim because the appellate court's determination was not contrary to Strickland. Neither was the appellate court's ineffective assistance determination based on an unreasonable determination of the facts or an unreasonable application of Strickland's standards to those facts. Further, the state court's determinations are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary, see 28 U.S.C. § 2254(e)(1), which Petitioner has not submitted. This claim is without merit and will be dismissed.

### 2. Procedurally Defaulted Claims

Petitioner also argues that trial counsel was ineffective by: (a) failing to adequately meet with Petitioner and advise him of possible defenses; (b) failing to investigate and present favorable defense witnesses; (c) failing to adequately investigate the State's witnesses; (d) failing to pursue a motion for change of venue after jury selection; (e) failing to object to the unsworn testimony of the victim; (f) failing to object to ex parte communication between the trial judge and the jury; (g) failing to inform Petitioner of a plea offer; (h) failing to introduce exculpatory medical records of the victim; (i) failing to adequately cross-examine Petitioner's wife about their arguments; and (j) failing to include the transcript of jury selection on direct appeal. (Doc. No. 1 at 12).

In his amended petition for post conviction relief, Petitioner argued that his attorney was ineffective for all the same reasons set forth above. (Doc. No. 16, Attach. 15 at 81-82). However, on appeal of the denial of post-conviction relief, Petitioner only advanced the claim that his trial

counsel was ineffective by failing to file a motion for recusal based upon the trial judge's professional acquaintance with the victim's father.  State v. Poston, 2017 WL 4221147, at *6 (noting that "Petitioner raised numerous allegations of ineffective assistance of counsel in the post-conviction court, but on appeal, he has limited his challenge to the post-conviction court's ruling" with regard to the motion for recusal).[2]

The time for raising the claims in the state courts has passed.  See Tenn. Code Ann. § 40-30-106(g); Tenn Code Ann. §§ 40-30-102(a), (c) (setting one-year limitations period for post-conviction relief).  Petitioner is now barred by the post-conviction statute of limitations and restrictions on successive state petitions from raising them at this time.  He cannot now return to the state courts to properly exhaust these allegations of ineffective assistance due to the expiration of the state statute of limitations on post-conviction actions and the "one petition" limitation on post-conviction actions. See Tenn. Code Ann. § 40-30-102(a) (statute of limitations); id. § 40-30-102(c) (one petition for state post-conviction relief). Therefore, Petitioner has procedurally defaulted these claims.

Because Petitioner has never fully and fairly presented these claims to the state courts, and a state procedural rule prohibits the state court from extending further consideration to them, the claims are deemed exhausted (because there is no "available" state remedy) but procedurally defaulted from federal habeas review.  See Coleman, 501 U.S. at 752-53.

Petitioner does not acknowledge his default of these claims and does not argue cause and prejudice to excuse the default.  Because Petitioner has not offered any basis to excuse the default

---

[2] On post-conviction appeal, Petitioner argued that trial counsel engaged in improper ex parte communication with the jury by asking them during their deliberations if they wanted the clerk to order food for them.  Poston, 2017 WL 4221147, at *8.  Even though there are similarities between that claim and Petitioner's present claim that trial counsel was ineffective by for failing to object ex parte communications between the trial court and the jury (Doc. No. 1 at 12), the claims are fundamentally different.   In any event, the Tennessee Court of Criminal Appeals determined that Petitioner's ex parte communication claim was waived because Petitioner failed to raise his challenge in the trial court and in the previous appeal.  Id.

and it does not appear that a fundamental miscarriage of justice will occur if these claims are not reviewed at this time, these claims are not subject to further review and will be dismissed.

The Court notes that, even if Petitioner had argued he could excuse the default of these claims under <u>Martinez</u>, it is well settled that the ineffective assistance of counsel during post-conviction appeal does not constitute cause to overcome procedural default. <u>Middlebrooks v. Carpenter</u>, 843 F.3d 1127, 1136 (6th Cir. 2016); <u>Coleman</u>, 501 U.S. 722, 742-53 (1991); <u>Martinez</u>, 566 U.S. 1, 13. Specifically, the <u>Martinez</u> exception does not apply to claims that were raised at the post-conviction initial-review proceeding but not preserved on post-conviction appeal. <u>West v. Carpenter</u>, 790 F.3d 693, 698-99 (6th Cir. 2015) (holding that "attorney error at state post-conviction appellate proceedings cannot excuse procedural default under the <u>Martinez</u>-<u>Trevino</u> framework."). This is because a petitioner whose claims were heard on the merits on post-conviction initial review has received the opportunity <u>Martinez</u> was fashioned to guarantee: to ensure that "the claim will have been addressed by one court, whether it be the trial court, the appellate court on direct review, or the trial court in an initial review collateral proceeding." <u>Martinez</u>, 566 U.S. at 11. Accordingly, ineffective assistance of post-conviction appellate counsel does not qualify as cause to excuse claims defaulted at that stage of proceedings, <u>see also Young v. Colson</u>, No. 3:12-CV-00304, 2015 WL 9581768, at *11 (M.D. Tenn. Dec. 30, 2015) (Trauger, J.), and does not save Petitioner's defaulted claims here.

## VI. Conclusion

For the reasons set forth herein, the petition filed by Michael Poston seeking relief under § 2254 will be denied, and this action will be dismissed with prejudice.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. §

2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." <u>Miller–El</u>, 537 U.S. at 327. The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Because jurists of reason would not disagree with the resolution of Petitioner's claims, the court will deny a COA.

An appropriate Order will be entered.

_____

WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE